UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CAPT CHANCE, INC., LEONARD SHRIMP
PRODUCERS, INC., ST. PAUL FIRE &
MARINE INSURANCE CO., and ZURICH
AMERICAN INSURANCE CO.,**

    **Plaintiffs,**

vs.               Case No. 8:06-cv-560-T-27MSS

**UNITED STATES OF AMERICA,**

    **Defendant.**

              /

## ORDER

**BEFORE THE COURT** are: 1) Plaintiffs' Motion for Summary Judgment on the Issue of Liability (Dkt. 19), to which Defendant has responded in opposition (Dkt. 24); and 2) Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, Alternatively, for Summary Judgment (Dkt. 21), to which Plaintiff has responded in opposition (Dkt. 22). Upon consideration, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

*Background*

Plaintiffs filed this admiralty action pursuant to the Suits in Admiralty Act (SAA), 46 U.S.C. §§ 30901 *et seq.*, contending that the United States Coast Guard was negligent in locating, marking, and notifying mariners of a submerged channel marker, which they allege caused the sinking of Plaintiffs' vessel. In the instant motions, the parties dispute whether the Coast Guard's actions fall within the "discretionary function exception" to the United States' statutory waiver of sovereign immunity.

1

The CAPT CHANCE was a commercial fishing vessel used to catch shrimp. (Pulsifer Dep. at 108). Plaintiff Capt. Chance, Inc. was the sole owner of the CAPT CHANCE. (Dan Leonard Dep. at 36). Plaintiff Leonard Shrimp Producers, Inc. operated the CAPT CHANCE. (Dan Leonard Dep. at 13). Plaintiffs St. Paul Fire & Marine Insurance Co., Zurich American Insurance Co., and Great American Insurance Company of New York provided insurance coverage for the CAPT CHANCE and Leonard Shrimp. (Dan Leonard Dep. at 107, Exh. 7; Price Aff. ¶¶ 3-4).

On November 30, 2005, the Coast Guard received a call from another vessel, the F/V JULIE ANN, reporting that the Anclote Anchorage South Entrance Daybeacon 10 (hereinafter "Daybeacon 10") was missing. (Dkt. 20-9 at 20).[1] The Daybeacon 10 was a fixed aid to navigation positioned and maintained by the Coast Guard.[2] (Dkt. 12, ¶ 6; Estades Dep., Exh. 7). That same day, the Coast Guard dispatched a Trailerable Aids to Navigation Boat ("TANB boat"), led by Petty Officer Alfonso Estades, which determined that the Daybeacon 10 was missing. (Dkt. 20-9 at 2, 20; Estades Dep. at 48). The crew was not able to use its AAPS positioning software to locate the Daybeacon 10, due to a corroded wire on the boat's laptop computer. (Estades Dep. at 66). Instead, the crew conducted a wire sweep of a defined area, using an electronic chart plotter, water depth, channel alignment, the chart, and visual channel alignment. (Estades Dep. at 72, 92; Dkt. 20-9 at 20). The crew could not locate the Daybeacon 10. They deployed a temporary lighted buoy, marked "Wreck 10," on the assigned position of the Daybeacon 10, according to the chart plotter. (Dkts. 20-9 at 20;

---

[1] Plaintiffs note that the Coast Guard received a report from the JULIE ANN on November 27, 2005 that there was a submerged piling in the area of the Daybeacon 10. (Merkle Dep. at 89-90). To the extent there exists a dispute regarding the time when the Coast Guard was first notified that the Daybeacon 10 was missing, this dispute is not material to the sovereign immunity discussion because Plaintiffs have not argued that any fixed or readily ascertainable standard provides for when searches must be commenced.

[2] Specifically, the Daybeacon 10 was a steel piling channel marker, shaped liked an "H" piling with 12 inch by 12 inch dimensions. (Dkt. 20-10 at 1).

20-10 at 2; Estades Dep. at 89-90). The buoy contained a quick flashing light to warn mariners of the downed aid. (Estades Dep. at 89).

The Coast Guard issued Broadcast Notices to Mariners between November 30, 2005 and December 13, 2005, which advised that the Daybeacon 10 was missing and that a temporary lighted buoy was set in the Daybeacon 10's assigned position. (Dkt. 21-5 at 2). The Coast Guard also published in its weekly Local Notice to Mariners that the Daybeacon 10 was temporarily replaced by a lighted buoy from December 6, 2005 until it was repaired in June 2006. (Dkt. 21-5 at 2-3).

On January 17, 2006, Captain Donald Leonard of the CAPT CHANCE and one other crewman were returning home after three weeks of shrimping in the Florida Keys. (Don Leonard Dep. at 17). In the early morning, the CAPT CHANCE struck the submerged remains of the Daybeacon 10 and sank. (Dkt. 20-10 at 5). On January 19, 2006, the TLRB was found 84.81 yards from the assigned position of the Daybeacon 10. (Dkt. 20-10 at 5).

### *Standard*[3]

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d

---

[3] Although Plaintiffs style their motion as one for summary judgment, Plaintiffs and Defendant both appear to assert that this case is reviewed under Rule 12(b)(1), rather than Rule 56. (Dkt. 19 at 8; Dkt. 21 at 8). In addressing a challenge to subject matter jurisdiction, a court may rely on Rule 12(b)(1) only "if the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003). The instant motions address the negligence of the United States and the comparative fault of Plaintiffs. Moreover, a determination of whether the relevant statutes, regulations, and internal guidelines supply the Coast Guard with discretion necessarily involve a discussion of the nature of the Coast Guard's duty and whether it breached its duty. Accordingly, the motions are reviewed under the more stringent summary judgment standard.

1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## *Discussion*

The United States enjoys sovereign immunity from suit unless it consents to be sued or waives sovereign immunity. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34-35 (1992). If sovereign immunity applies, this Court lacks subject matter jurisdiction. *United States v. Testan*, 424 U.S. 392, 399 (1976). The Suits in Admiralty Act, 46 U.S.C. §§ 30901 *et seq.*, pursuant to which Plaintiffs filed this case, includes an explicit waiver of sovereign immunity. *See* 46 U.S.C. § 30903.[4]

---

[4] 46 U.S.C. § 30903(a) provides: "In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty

4

However, the government's waiver of sovereign immunity in admiralty actions is subject to the "discretionary function exception" identified in the Federal Tort Claims Act, 28 U.S.C. § 2680(a). *Id.* at 1204.[5]

The discretionary function exception essentially narrows the waiver of sovereign immunity where a party challenges public policy-driven conduct and governmental decisionmaking. *United States v. Gaubert*, 499 U.S. 315, 325 (1991). When determining whether the discretionary function exception bars suit against the United States, a two-part test is implemented. *See Cranford v. United States*, 466 F.3d 955, 958 (11th Cir. 2006). First, the court considers the nature of the conduct and determines whether it involves "an element of judgment or choice." *Id.* (citations omitted); *Gaubert*, 499 U.S. at 322. "The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Gaubert,* 499 U.S. at 323 (quotations and citations omitted). Such a federal statute, regulation, or policy must prescribe "a course of action embodying a *fixed or readily ascertainable standard*." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997) (emphasis in original).

Second, if the conduct at issue involves the exercise of judgment, the court must determine

---

could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation."

[5] Section 2680(a), in which the discretionary function exception is found, provides that the United States retains sovereign immunity against:
> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused

"whether the judgment or choice is grounded in considerations of public policy." *Cranford,* 466 F.3d at 958. The focus is on the nature of the conduct and whether it is susceptible to policy analysis. *Id.* It must be determined whether the "judgment is of the kind that the discretionary function exception was designed to shield." *See Mid-South Holding Co., Inc. v. United States*, 225 F.3d 1201, 1205 (11th Cir. 2000).

Plaintiffs contend the United States was negligent in searching and failing to locate the Daybeacon 10, in positioning the temporary buoy, and in issuing warnings to mariners. Plaintiffs place primary reliance on provisions contained in the Coast Guard's "Aids to Navigation Manual" (ATON Manual), which they contend supply the requisite "fixed or readily ascertainable standards."

An agency's internal guidelines are relevant to the discretionary function analysis. *Gaubert*, 499 U.S. at 324; *Phillips v. United States*, 956 F.2d 1071, 1076 (11th Cir. 1992). With respect to the ATON Manual, however, the Eleventh Circuit has specifically stated:

> [t]he Aids to Navigation Administration Manual (ATON Manual), which contains internal guidelines of the Coast Guard regarding the marking of wrecks, states that "the Coast Guard retains the discretion to deviate or authorize deviation from" its "requirements." The ATON Manual creates "no duties or obligations to the public to comply with the procedures" described in it, and the ATON Manual states that "no member of the public should rely upon the[ ] procedures as a representation by the Coast Guard as to the manner of performance of [the] aids to navigation mission." The Melechs and Cranford fail to identify " 'a federal statute, regulation, or policy [that] specifically prescribes a course of action embodying a *fixed* or *readily ascertainable* standard.' " *Cranford*, 466 F.3d at 959 (citations omitted).

The United States argues, based on this language, that the ATON Manual's disclaimers prevent the establishment of a fixed or readily ascertainable standard. (Dkt. 24 at 6). A competing reading of *Cranford* is, of course, that the plaintiffs in that case merely failed to identify a relevant non-discretionary standard. A resolution of these conflicting interpretations is not necessary for the resolution of this case, however. This Court finds that the excerpts from the ATON Manual on

6

which Plaintiffs rely do not supply fixed or readily ascertainable standards necessary to defeat the application of the discretionary function exception. Rather, the relevant standards preserve in the Coast Guard elements of judgment and choice.

*a. Searching for the Daybeacon 10*

The United States contends that the Coast Guard retains wide discretion in the operation and maintenance of aids to navigation, under the relevant statutes and regulations:

> In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels and aircraft, the Coast Guard *may* establish, maintain, and operate: aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States.
> 14 U.S.C. § 81(1) (emphasis added).
>
> For the purpose of executing the duties and functions of the Coast Guard the Commandant *may* . . . acquire, accept as gift, maintain, repair, and discontinue aids to navigation, appliances, equipment, and supplies.
> 14 U.S.C. § 93(a)(9) (emphasis added)
>
> (f) Although aids to navigation are maintained to a reasonable degree of reliability, the rigors of the marine environment and various equipment failures do cause discrepancies on occasion.
> 33 C.F.R. § 62.21(f)

Plaintiffs, on the other hand, argue that the ATON Manual and the Standard Operating Procedures ("SOP") issued by the Commander of the Seventh Coast Guard District contain non-discretionary language in describing the steps to be taken to locate a downed aid to navigation:

> The wreckage must be located and recovered at the earliest possible opportunity. If not recovered, or adequately marked, it's a hazard to navigation. . . . When using either method of wire sweeping, be both patient and persistent. While there is a chance that a wooden aid may float away after it's knocked down, it may have broken above the mud line leaving a stump that can cause severe damage to a vessel striking it. There is never any doubt where the remains of a steel or concrete structure are -- they're on [assigned position]. Your job is to find them. It's not uncommon to search for hours, or even days, for a downed structure. . . . It cannot be said too often, or emphasized too strongly, that we must employ every method at our disposal to locate and remove the wreckage of destroyed ATON structures.

7

(Dkt. 20-20 at 13; Seamanship, Ch. 12(G)(1)-(2)) (emphasis added).

Units shall use a depth finder and wire drag to thoroughly search the vicinity of downed aids; if the aid consisted of a steel or concrete pile structure, the search will continue until the wreckage is located or all available search resources have been exhausted. (Dkt. 20-22 at 15; SOP, Annex N, App. 1, Tab P, ¶ 7(a)(1)).

The ATON Manual provides that the Coast Guard shall assess and deploy "available" methods to conduct a "thorough" search. Although the TANB crew used a depth finder and wire drag for approximately one hour, Plaintiffs contend that the crew did not exhaust "*all available search resources.*" Specifically, they argue that the Coast Guard was authorized to use divers and side scan sonar, which are additional methods provided for in the ATON Manual. (Dkt. 20-22 at 15; SOP, Annex N, App. 1, Tab P ¶ 7(a)(2)-(3)).

Whether the crew actually failed to exhaust all available search resources is not the issue when determining whether the conduct involved an element of judgment or choice. It is the *nature* of the conduct that is the relevant inquiry. *Gaubert*, 499 U.S. at 322. While policy considerations may be "precisely formulated" at the administrative level, this does not necessitate a finding that the conduct lacks elements of judgment or choice. *Cranford*, 466 F.3d at 960; *see also Mid-South Holding Co.*, 225 F.3d at 1207 ("Although the attendant details could be characterized as mundane or as disengaged from any substantial policy consideration, they are nonetheless critical to the performance of the discretionary scheme.")

In this case, the Coast Guard was vested with discretion in conducting the search for the Daybeacon. Although the ATON Manual urges the Coast Guard to locate missing aids to navigation, the Coast Guard is given discretion in the manner in which it accomplishes this goal. The TANB crew had discretion as to how the search was undertaken -- such as using different wire drag

methods, divers, or sonar -- and no fixed time limit was provided for the completion of the search.[6] *See also Gaubert*, 499 U.S. at 325 ("Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest.")  Accordingly, the language relied on by Plaintiffs does not amount to the requisite *fixed* or *readily ascertainable* standard.  *See Smith v. United States*, 251 F. Supp. 2d 1255, 1260 (D. Md. 2003) (finding ATON Manual's provisions regarding response to missing daybeacon involved elements of judgment and choice); *Harrell v. United States*, 443 F.3d 1231, 1235 (10th Cir. 2006) (finding that statutes, regulations, and ATON Manual reserved discretion to the Coast Guard in maintaining aids to navigation); *cf. Cranford* (observing that decisions resting on mathematical calculations may involve no choice or judgment). Rather, the ATON Manual includes elements of judgment and choice, thus meeting the first prong of the discretionary function analysis.

Plaintiffs have not addressed the second prong of the discretionary function inquiry, which focuses on whether the challenged conduct is susceptible to a policy analysis.  When the relevant statute, rule or policy "allows a [g]overnment agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

In the instant case, the challenged conduct is rooted in the Coast Guard's broad authority to operate and maintain aids to navigation. *See e.g.*, 14 U.S.C. § 81(1); 14 U.S.C. § 93(a)(9). There are well-established policy considerations associated with these responsibilities, which were noted by the Eleventh Circuit in *Cranford*: "taking into account the knowledge and customs of international

---

[6] Plaintiffs do cite to a provision that states: "If a discrepant structure has remnants or debris in the water, divers and/or the servicing construction tender will remove the downed aid and debris within **30 days** to prevent pieces from floating off and potentially causing damage to other vessel traffic." (Dkt. 20-21 at 9; Annex 1, App. 1, Tab C ¶ 1(h)(a)(5)(b)) (emphasis added). There is, however, no allegation by plaintiffs that the steel Daybeacon 10 had remnants or debris in the water that were capable of floating off. *See also* Estades Dep. at 89; Dkt. 20-20 at 13; Seamanship, Ch. 12(G)(1)-(2).

9

mariners, balancing the needs of pleasure and commercial watercraft, and evaluating agency resources constraints, which include but are not limited to financial concerns." *Cranford*, 466 F.3d at 960. In searching for downed aids to navigation, the Coast Guard must balance the goal of locating the wreckage with concerns regarding efficiency and allocation of limited resources. The Coast Guard's conduct, under the facts of the instant case, is therefore "susceptible to a policy analysis."

Based on the foregoing, the Court finds that the Coast Guard's search for the Daybeacon 10 involved elements of judgment or choice, and is the type of conduct that the discretionary function is designed to shield.

*b. Positioning the temporary buoy*

Plaintiffs also allege that the Coast Guard was negligent in positioning the temporary buoy over the remains of the Daybeacon 10. Plaintiffs contend that the ATON Manual provides non-discretionary instruction for the positioning of temporary buoys, which eliminates any element of judgment or choice. Specifically, the ATON Manual provides that the "primary method" for positioning aids to navigation is DGPS, which "must be electronically transmitted into an approved aids to navigation positioning program." (Dkt. 20-16 at 10; Positioning, Chap. 2(B)(1)). When DGPS is unavailable, GPS may also be used on an approved aids to navigation positioning program. (Dkt. 20-16 at 11-1; Chap. 2(D)). The only authorized aid to navigation positioning program is AAPS (Automated Aid Positioning System). (Dkt. 20-16 at 41; Chap. 6(C)). The ATON Manual further provides that: "Navigational charts, paper or electronic, shall not be used for positioning aids to navigation or to scale positions of reference objects." (Dkt. 20-16 at 14; Chap. 2(G)).

Plaintiffs contend that the Coast Guard located the temporary buoy without the aid of DGPS

or GPS. As set forth above, the AAPS software was not operational when the TANB crew was sent to locate the Daybeacon 10. However, the ATON Manual specifically provides that: "**Deviations from these guidelines are authorized when necessary to best meet the objectives and standards of aid positioning**." (Dkt. 20-16 at 10; Chap. 2(A)) (emphasis in original). The ATON Manual also specifically provides that "[i]f DGPS becomes unavailable for an extended period of time, alternative positioning methods should be considered." (Dkt. 20-16 at 11; Chap. 2(B), Note). Petty Officer Estades testified that he used the chart plotter, which had GPS input, and wire depth, channel alignment and visual marks to place the temporary buoy. (Estades Dep. 68, 90, 92).

The Court finds that the ATON Manual's provisions, as cited by the Plaintiffs, do not constitute the requisite fixed or readily ascertainable standards. The ATON Manual preserves discretion for the Coast Guard to use methods to locate aids to navigation other than the recommended methods, as necessary. Moreover, for the reasons discussed above, the Court finds that this conduct is the type shielded by the discretionary function analysis.

*c. Issuance of warning*

Finally, the United States contends that the discretionary function exception applies to its issuance of warnings to mariners regarding the Daybeacon 10. The relevant regulation provides:

> The Coast Guard makes reasonable efforts to inform the navigator of known discrepancies, and to correct them within a reasonable period of time, depending upon resources available. Occasionally, a temporary aid to navigation, which provides different but similar service, is deployed until permanent repairs can be made to the original aid. Notification of such temporary changes is made through the notice to mariners system.
> 33 C.F.R. § 62.21(g).

The ATON Manual provides that "The District Commander has broad discretion in determining the content of safety and security information in the Local Notices to Mariners." (Dkt. 20-14 at 57;

Administration, Chap. 12(B)(2)(a)). In addition, the relevant SOP provides:

> Upon marking a destroyed aid, Group Commanders must immediately issue a Broadcast Notice to Mariners stating that the fixed-aid has been temporarily replaced/marked with a buoy. In addition, the Broadcast Notice to Mariners should state whether or not wreckage is still located at the site. (Dkt. 20-22 at 16, SOP, Annex N, App. 1, Tab P ¶ 7(b)(5)).

While Plaintiffs acknowledge that the Coast Guard issued a Broadcast Notice to Mariners and a Local Notice to Mariners informing mariners that the Daybeacon 10 had been temporarily replaced by a lighted buoy, Plaintiffs maintain that the Coast Guard was negligent in failing to state whether the wreckage was still located at the site. The relevant SOP does not, however, mandate that the Broadcast Notice state whether or not wreckage is still located at the site. Rather, it provides that "the Broadcast Notice to Mariners *should* state whether or not wreckage is still located at the site." An element of judgment or choice is implicit in this provision of the SOP. In any event, the Daybeacon 10 was "missing." Since the Coast Guard complied with the relevant directive, the discretionary function exception applies. *Gaubert*, 499 U.S. at 324 ("if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected.")

*Conclusion*

For the reasons discussed, the Coast Guard's actions are susceptible to a policy analysis and therefore falls within the discretionary function exception. The United States is therefore immune from suit in this action. Accordingly, it is **ORDERED AND ADJUDGED** that:

1) Plaintiffs' Motion for Summary Judgment on the Issue of Liability (Dkt. 19) is **DENIED**;

2) Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, Alternatively, for Summary Judgment (Dkt. 21) is **GRANTED**;

3)   All pending motions are **DENIED** as moot;

4)   The Clerk is directed to enter judgment in favor of Defendant United States of America and to close the case.

**DONE AND ORDERED** in chambers this 20th day of June, 2007.

                                            **JAMES D. WHITTEMORE**
                                            **United States District Judge**

Copies to:
Counsel of Record